Battle, J.
 

 We have not had much difficulty in coming to the conclusion that the plaintiff is entitled to some relief, hut have not found it so easy to determine what that relief should he. It is very certain, that at, and for some months before the time when the plaintiff contracted for the purchase of the defendant Dwiggins’ store, the former had become an habitual drunkard, which had produced its usual effects, upon both his body and his mind. To what extent it had impaired the latter the witnesses do not agree. Most of those examined for the plaintiff testify that, in their opinion, the plaintiff was, during the latter part of the year, 1851, and the early part of the year, 1852, entirely incapable of. transacting business with ordinary understanding and prudence. A few of the witnesses for the defendants, state that his mind was not at all affected by drunkenness; while the most of them, though not concurring entirely in that opinion, thought him capable of conducting ordinary business with ordinary prudence. Such was the opinion of
 
 Milton II. Linville,
 
 the gentleman who drew the deed in trust, which was executed by the parties on the 6th day of January, 1852. Ho states, that on that day Hie plaintiff “ had been drinking, but was not drunk, though not completely sober,”
 
 “
 
 that he had sufficient mind to transact ordinary business that “ his
 
 *163
 
 face and eyes seemed swollen considerablyand that
 
 “
 
 he was tolerably drank by the middle of the afternoon.” ITad the transaction between the parties been one of an
 
 ord/'mavy
 
 character, we should have felt ourselves bound to declare, either that the testimony was so equally balanced that the plaintiff, upon whom lay the burden of proof, had failed to entitle himself to a decree, or that it was a proper case to be submitted to a jury upon an issue made up for that purpose. But we think it was not an
 
 ord/ma/ry
 
 transaction: on the contrary, that it was, under the circumstances, a most
 
 extraordinary
 
 one; and' that it furnishes in, and of itself, plenary proof that the plaintiff was the victim of a gross imposition, practiced upon him by one, or both of the defendants. It is fully proved that at the time, and just before tire trade was made, the defendant was in the habit of drinking to great excess, and that this .was known to the defendant Dwiggins. • It is certain, that the plaintiff had never been a merchant,’and knew nothing of mercantile affairs ; and it is equally certain that the defendant Tindall had been previously in the employment of Dwiggins, and. was still in his confidence. It is clear from the proof, that the.habits of the plaintiff had produced great derangement in his pecuniary affairs, and that he was rapidly approaching, and must soon reach, unless arrested in his mad career, a state of insolvency; of all which the de-‘ fendant Dwiggins could not be ignorant. It was with such a man, and under such circumstances, that the defendant, Dwig-gins, undertook to make a bargain for the sale of his stock of goods, of which lie was anxious to dispose. Let us.see what were the terms as finally fixed upon by the parties. ~We say nothing of the price of the goods, nor of the manner in which that price was ascertained by the inventory. That may have been fair, and was so, provided the defendants were honest; for it is evident from the proof that the plaintiff had nothing to do with that part of the business. But the value of the goods, having been thus ascertained to he $1415 79, the defendant, Dwiggins, received from the plaintiff as a cash pay-Inent (or what was equivalent to a cash payment) in part there
 
 *164
 
 for, the stun of $650, and upon, the failure of the plaintiff to give personal security for the residue, to wit, the sum of $795 79, took, for the purpose of securing the same, a deed in trust upon a negro man slave, one horse, three wagons, and all the goods, wares and merchandise which the plaintiff had just bought.at the price above stated. The deed was executed on the 6th day of January, 1852, and it was provided that if the debt was not paid on the 20th day of the same month, the defendant Tindall, who was the trustee, was, at the request of Dwiggins, and after twenty days advertisement, to sell the whole of the property therein conveyed, at public auction for cash, or, as it was called
 
 {<
 
 ready money.” In the mean while, and until such sale should be made, the deed goes on to say, that “ it is plainly and well understood that said "William 0. Tindall, the trustee in this case, is to have entire possession of the store-house and its contents, viz : the goods, &c., &c.; is to keep the key of the said store-house and sell the goods of the same; receive the monies,
 
 &c.,
 
 paid
 
 him for
 
 said
 
 goods;
 
 and have the entire control of the store-house, goods, &c., until said debt is paid.” This latter provision, Mr. Linville tells us, was first suggested to him by Dwiggins in the absence of the plaintiff, but he believes the latter was present when it was talked of while he was writing the deed. IIow near this was to’the middle of the afternoon, when the plaintiff was “ tolerably drunk” we are not informed. But we think none but a lunatic, or a man stupified with drink, would have given his consent to such a stipulation. A credit of fourteen days, a sale of the goods at auction for cash, upon a failure to pay within that time, and the total exclusion from the management of his own store, were terms imposed upon the plaintiff', the like of which were never heard of before, and we trust, will never be heard of again. The result was, as every sane man must have foreseen, that in about four months the plaintiff’s property was all sold to pay the residue of the debt for the price of the goods, and he was left totally insolvent. The robbery of the store while under the exclusive control of the defendant Tindall, whether actual or pretended, may be
 
 *165
 
 regarded as a fortunate circumstance for tlie plaintiff, as it hastened the catastrophe, and the sooner dispelled from his mind the drunken dream of "being a merchant. This Court would be faithless to one of its highest trusts, did it not afford him an adequate relief against those, who well knowing his, condition, took advantage of it for their own selfish purposes of gain. "What the precise character of that relief shall be, we have not found it so easy to determine. The contract cannot be rescinded, so as to put tire parties in the same condition in which they were when it was made. That would be the proper course, were it practicable, but not being so, we must give a relief approaching as near to it as we can. That will be to consider the goods as having been disposed of by the defendant Dwiggins, through the defendant Tindall as his agent, for his own benefit, and to make him account to the plaintiff for a fair value of every thing he received from him. lie ought to be allowed a fair rent for the occupation of his storehouse by the plaintiff and his family, and to be reimbursed for every thing which he may have paid for the plaintiff on the second trust. The necessary accounts must be taken with a view to this mode of settlement, and the cause will be retained for further directions until they come in. This case though resembling that of
 
 Moore
 
 v.
 
 Reed,
 
 2 Ire. Eq. Rep. 580, in some respects, differs from it in the very important particular, that here the contract never was ratified by the plaintiff while in a condition better than he was wlien it was first imposed upon him.
 

 Per Curiam. ' Decree for an account.